# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | : | MDL No. 2067 |
|  | : |  |
| CELEXA AND LEXAPRO MARKETING | : | Master Docket No. 09–MD–2067 (NMG) |
| AND SALES PRACTICES LITIGATION | : |  |
|  | : | Judge Nathaniel M. Gorton |
| THIS DOCUMENT RELATES TO: | : |  |
|  | : |  |
| RANDY and BONNIE MARCUS, on | : |  |
| behalf of themselves and all other persons | : |  |
| similarly situated | : |  |
| *Plaintiffs* | : | No. 13–CV–11343 (NMG) |
| v. | : |  |
| FOREST LABORATORIES, INC. and | : |  |
| FOREST PHARMACEUTICALS, INC. | : |  |
| *Defendants* | : |  |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE *MARCUS* COMPLAINT

SUGARMAN, ROGERS, BARSHAK
& COHEN, P.C.
101 Merrimac Street
Boston, MA 02114
Tel.:  (617) 227–3030
Fax.: (617) 523-4001

*Of counsel*:

Natasha C. Lisman (BBO # 301700)
William F. Benson (BBO # 646808)
lisman@srbc.com
benson @srbc.com

DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY  10022
Tel.:  (212) 909–6000
Fax:  (212) 909–6836

*Of counsel*:

Edwin G. Schallert
Kristin D. Kiehn
J. Robert Abraham
egschall@debevoise.com
kdkiehn@debevoise.com
jrabraham@debevoise.com

*Attorneys for Defendants Forest Laboratories, Inc. and Forest Pharmaceuticals, Inc.*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................. 1

I.       STATEMENT OF FACTS AND ALLEGATIONS ...................................................... 3

   A.   THE FDA HAS DETERMINED THAT LEXAPRO IS EFFECTIVE FOR THE TREATMENT
        OF ADOLESCENT DEPRESSION AND HAS APPROVED LEXAPRO'S LABEL ............................ 3

   B.   THE COMPLAINT ALLEGES THAT LEXAPRO'S FDA-APPROVED LABEL IS FALSE
        AND MISLEADING ............................................................................................................ 5

   C.   PROCEDURAL HISTORY ................................................................................................ 6

II.      ARGUMENT ............................................................................................................. 7

   A.   THE FDA HAS SOLE AUTHORITY OVER THE REGULATION OF PRESCRIPTION
        DRUGS AND DETERMINATIONS ABOUT EFFICACY ............................................................ 7

   B.   PLAINTIFFS' CLAIMS ARE BARRED BY THE SAFE HARBOR DOCTRINE ........................... 10

   C.   PLAINTIFFS' CLAIMS ARE PREEMPTED UNDER FEDERAL LAW. ...................................... 12

   D.   PLAINTIFFS' CLAIMS LIE WITHIN THE PRIMARY JURISDICTION OF THE FDA AND
        ARE NOT PROPERLY REVIEWED BY THIS COURT. ........................................................... 18

CONCLUSION ..................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

CASES

*Aaronson v. Vital Pharm., Inc.*, No. 09-CV-1333, 2010 WL 625337
(S.D. Cal. Feb. 17, 2010) ................................................................................................19

*Alvarez v. Chevron Corp.*, 656 F.3d 925 (9th Cir. 2011) ............................................................11

*Am. Tel. & Tel. Co. v. IMR Capital Corp.*, 888 F. Supp. 221 (D. Mass. 1995)...........................20

*Bernhardt v. Pfizer, Inc.*, Nos. 00 Civ. 4042 LMM, 00 Civ. 4379 LMM, 2000 WL
1738645 (S.D.N.Y. Nov. 22, 2000) ...............................................................................19

*Bober v. Glaxo Wellcome PLC*, 246 F.3d 934 (7th Cir. 2001) ....................................................11

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) ..................................................13

*Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 Fed. Appx. 113 (9th Cir. 2012).......................17

*Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (Cal. 1999) .....10, 12

*Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*, 228 F.3d 24 (1st Cir. 2000) ...........................3

*Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp. 2d 296 (S.D.N.Y. 1998) .............................9

*Davis v. HSBC Bank Nevada*, 691 F.3d 1152 (9th Cir. 2012).....................................................10

*DePriest v. AstraZeneca Pharm., L.P.*, 351 S.W.3d 168 (Ark. 2009)..........................................12

*Eckhardt v. Qualitest Pharm. Inc.*, 858 F. Supp. 2d 792 (S.D. Tex. 2012)..................................17

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995).....................................................................13

*Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961 (6th Cir. 2004) ......................................................13

*Hill v. Novartis Pharm. Corp.*, No. 1:06-CV-00939-JSR-SAB, 2013 WL 1953753
(E.D. Cal. May 10, 2013)...............................................................................................17

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ...................................................................................13

*Horne v. Novartis Pharm. Corp.*, 541 F. Supp. 2d 768 (W.D. N.C. 2008) ...................................4

*In re Bextra and Celebrex Mktg. Sales Practices and Prods. Liab. Litig.*, No. M: 05-1699
CRB, 2006 WL 2374742 (N.D. Cal. Aug. 16, 2006) .....................................................15

*In re Darvocet, Darvon and Propoxyphene Prods. Liab. Litig.*, No. 2:11-md-2226-DCR,
2012 WL 718618 (E.D. Ky. March 5, 2012) ..................................................................17

*In re Fosamax Prods. Liab. Litig. II*, Civ. No. 08-008, 2011 WL 5903623
(D.N.J. Nov. 21, 2011).........................................................................................17

*In re Human Tissue Prods. Liab. Litig.*, 488 F. Supp. 2d 430 (D.N.J. 2007)...............................19

*Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780 (Cal. App. 2002) .....................................17

*Lopez v. Nissan N. Am., Inc.*, 201 Cal. App. 4th 572 (Cal. App. 2011)........................................11

*Mass. v. Blackstone Valley Elec. Co.*, 67 F.3d 981 (1st Cir. 1995) .....................................20

*Mut. Pharm. Co. v. Bartlett*, No. 12-142, 2013 WL 3155230 (U.S. June 24, 2013)..............13, 17

*Palmer Foundry, Inc. v. Delta-HA, Inc.*, 319 F. Supp. 2d 110 (D. Mass. 2004).........................20

*Pejepscot Indus. Park, Inc. v. Maine Central R.R.*, 215 F.3d 195 (1st Cir. 2000) .......................18

*Penn. Emps. Benefit Trust Fund v. Zeneca, Inc.*, 499 F.3d 239 (3d Cir. 2007)............................9

*Pfizer, Inc. v. Superior Court*, 105 Cal. Rptr. 3d 795 (Cal. Ct. App. 2010) ....................................6

*PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011) ...............................................................2, 13, 17

*Pom Wonderful LLC v. Coca-Cola Co*, 679 F.3d 1170 (9th Cir. 2012) ..................................11, 19

*Pom Wonderful LLC v. Coca-Cola Co.*, No. CV 08-06237 SJO, 2013 WL 543361
(C.D. Cal. Feb. 13, 2013)................................................................................11, 18

*Prohias v. AstraZeneca Pharm., L.P.*, 958 So.2d 1054 (Fla. Dist. Ct. App. 2007).....................12

*Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228 (S.D. Fla. 2007) ..........................................9, 12, 15

*Reiter v. Cooper*, 507 U.S. 258 (1993) ....................................................................................18

*Taradejna v. Gen. Mills, Inc.*, 909 F.Supp.2d 1128 (D. Minn. 2012) ..........................................19

*Truddle v. Wyeth, LLC*, No. 2:11-CV-00207-GHD-SAA, 2012 WL 3338715
(N.D. Miss. Aug. 14, 2012)...............................................................................17

*Turek v. Gen. Mills, Inc.*, 662 F.3d 423 (7th Cir. 2011) .......................................................11, 17

*Verizon New England, Inc. v. Maine Pub. Utils. Comm'n,* 509 F.3d 1 (1st Cir. 2007)................20

*Wyeth v. Levine*, 555 U.S. 555 (2009) .............................................................................9, 14, 15

STATUTES, RULES, AND REGULATIONS

21 C.F.R. § 10.30 .........................................................................................................19

21 C.F.R. § 314. ..................................................................................................8

21 C.F.R. § 314.3 ..............................................................................................16

21 C.F.R. § 314.50 ..............................................................................................8

21 C.F.R. § 314.70 ..............................................................................10, 14, 16

21 C.F.R. § 314.105 ..........................................................................8, 9, 10

21 C.F.R. § 314.125 ............................................................................................9

21 C.F.R. § 314.126 ............................................................................................9

21 U.S.C. § 301 ...................................................................................................7

21 U.S.C. § 331 .................................................................................................10

21 U.S.C. § 333 .................................................................................................10

21 U.S.C. § 352 .................................................................................................10

21 U.S.C. § 355 .....................................................................................8, 9, 15

21 U.S.C. § 393 ............................................................................................7, 18

Cal. Bus. & Prof. Code § 1770 ..........................................................................6

Cal. Bus. & Prof. Code § 1780 ..........................................................................6

Cal. Bus. & Prof. Code § 17200 ........................................................................5

Cal. Bus. & Prof. Code § 17500 ........................................................................6

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 20

U.S. Const. art. vi, cl. 2 ....................................................................................13

## OTHER AUTHORITIES

73 Fed. Reg. 49,604 (Aug. 22, 2008) ..............................................................10

73 Fed. Reg. 2849 (Jan. 16, 2008) ......................................................10, 12, 14

Report to Congressional Requesters, Government Accountability Office, Nov. 2006, New Drug Development, 26 Biotechnology L. Rep. 82 (2007) ......................8

U.S. Dep't of Health and Human Servs., Food & Drug Admin., Ctr. for Drug Evaluation and Res., Guidance for Industry:  Changes to an Approved NDA or ANDA (2004) ............16

Defendants Forest Laboratories, Inc. and Forest Pharmaceuticals, Inc. (together "Forest" or "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the complaint captioned *Marcus v. Forest Laboratories, Inc., et al.* (No. 13–CV–11343)[1] with prejudice for failure to state a claim on the grounds that the claims are barred under state law and preempted by federal law.  Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Although styled as a consumer fraud claim, in reality this complaint is an impermissible attack on the decision by the U.S. Food and Drug Administration ("FDA") to approve the antidepressant Lexapro for the treatment of adolescent depression.  Plaintiffs disagree with the FDA and seek to substitute their subjective opinion that Lexapro is no better than a sugar pill for the FDA's expert determination to the contrary.  Plaintiffs do not allege that Lexapro is unsafe or raises a safety concern for adolescents, nor do they allege that Defendants crafted misrepresentations in their marketing campaign.  Instead, the complaint makes the remarkable assertion that the ***FDA-approved label itself*** is false and misleading because it states the ***FDA's own conclusion*** that Lexapro is effective for adolescent depression.  Compl. ¶ 72.  Accepting Plaintiffs' theory would undermine the entire system of federal regulation of prescription drugs established by the U.S. Congress.  Plaintiffs' claim fails on multiple grounds, including that it is barred under California law, preempted by federal law, and improper under the primary jurisdiction doctrine.

***First***, Congress has entrusted the FDA with sole authority over the regulation of prescription drugs, including determinations about efficacy.  In 2009, the FDA approved Forest's

---

[1]   A copy of the complaint is attached as Exhibit 1 to the Declaration of J. Robert Abraham in Support of Defendants' Motion to Dismiss the *Marcus* Complaint, dated July 29, 2013 ("Abraham Decl.").

application to market Lexapro as a safe and effective treatment for major depression in adolescents.  In accordance with the Congressionally-mandated drug approval process, the FDA conducted a rigorous independent review of the clinical data and determined there is substantial evidence of efficacy.  Pursuant to applicable regulations, the FDA reviewed and approved Lexapro's label prior to authorizing the marketing of the drug for adolescent use.  The FDA's approval of a drug label reflects a determination—required by federal statute—that the label is **_neither false nor misleading_**.  Furthermore, Defendants were legally required to distribute Lexapro with its FDA-approved label.  Plaintiffs' claims therefore are barred by California's safe harbor doctrine, which holds that conduct specifically authorized or required by state or federal law is not actionable as a consumer protection violation.

*Second*, even if Plaintiffs' claims were permissible under California law—which they are not—the claims are preempted by federal law.  Under the Supreme Court's seminal decision in *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011), and its progeny, state-law claims against a pharmaceutical manufacturer that seek to impose a duty the manufacturer cannot independently satisfy consistent with its obligations under federal law are preempted.  Not only are Defendants required by federal law to distribute Lexapro with its FDA-approved label, but Defendants could not unilaterally make the changes to the label that Plaintiffs seek without the FDA's consent. The FDA has already adjudicated the very issues that Plaintiffs ask this Court to re-open. Principles of federal preemption therefore bar these claims.

*Third*, in the alternative, this Court is not the appropriate forum for Plaintiffs' grievances. The complaint is rooted in the contention that the FDA's determination that Lexapro is effective for adolescent depression was, at best, based on a decades-old flawed regulatory policy or, at worst, based on the FDA's failure to uncover Defendants' alleged manipulation of clinical study

data.  Judgments about the efficacy of prescription drugs are entrusted by Congress solely to the

expertise and competence of the FDA.

## I.      STATEMENT OF FACTS AND ALLEGATIONS[2]

### A.      THE FDA HAS DETERMINED THAT LEXAPRO IS EFFECTIVE FOR THE TREATMENT OF ADOLESCENT DEPRESSION AND HAS APPROVED LEXAPRO'S LABEL

Lexapro is an antidepressant manufactured and sold by Forest.  Compl. ¶¶ 11–12.

Lexapro belongs to a class of antidepressants known as selective serotonin reuptake inhibitors

("SSRI"), which includes other well-known products such as Prozac, Paxil, and Zoloft.  *Id.* ¶ 12.

SSRIs are commonly prescribed for the treatment of depression.  *Id.*  Lexapro is closely related

on a molecular level to another SSRI, Celexa, also manufactured and sold by Forest.  *Id.* ¶ 25.[3]

Following several phases of clinical testing, the FDA approved Lexapro as a safe and

effective treatment for adult depression in 2002, and as a safe and effective treatment for adult

generalized anxiety disorder in 2003.  *Id.* ¶ 27.   In 2008, Forest submitted a Supplemental New

Drug Application to the FDA seeking approval to market Lexapro as a safe and effective

treatment for depression in adolescents aged 12 to 17 (the "Lexapro sNDA").  *See id.* ¶ 50.  The

Application included data from a number of clinical trials examining the safety and efficacy of

Lexapro and Celexa in the treatment of pediatric depression, including Lexapro Study 32 (which

the FDA determined demonstrated efficacy for adolescent depression) and Celexa Study 18

(which the FDA determined demonstrated efficacy for pediatric depression).  *See id.* ¶¶ 50, 52.

---

[2]   The complaint's well-pleaded factual allegations are accepted as true solely for the purpose of Defendants' motion to dismiss, except to the extent they are contradicted by documents cited in the complaint.  *See Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 32 (1st Cir. 2000).

[3]   Although not relevant to this motion, Defendants disagree with Plaintiff's characterization of Lexapro and Celexa.  Celexa and Lexapro have related active ingredients.  Specifically, the active ingredient in Celexa is citalopram, a racemic mixture of two enantiomers:  escitalopram and R-citalopram.  The active ingredient in Lexapro is escitalopram.

As part of the sNDA review process, the FDA was required by statute to evaluate, among other things, the "safety and effectiveness" of Lexapro in the treatment of adolescent depression and the "appropriateness of the proposed labeling." *Id.* ¶ 13.  In March 2009, the FDA approved the Lexapro sNDA.  *Id.* ¶ 52.  The FDA also approved Lexapro's label, which states in relevant part:  "**Safety and effectiveness of Lexapro has been established in adolescents (12 to 17 years of age) for the treatment of major depressive disorder**."  *Id.* ¶ 57; *see also* Abraham Decl. Ex. 2 (FDA-approved Lexapro label).[4]

The "Clinical Studies" section of the FDA-approved label describes the clinical data which, in the FDA's determination, demonstrate substantial evidence of efficacy, as well as two studies that did not demonstrate efficacy:

> Adolescents
>
> **The efficacy of Lexapro as an acute treatment for major depressive disorder in adolescent patients was established in an 8-week, flexible-dose, placebo-controlled study that compared Lexapro 10–20 mg/day to placebo in outpatients 12 to 17 years of age inclusive who met DSM-IV criteria  for major depressive disorder [*i.e.*, Lexapro Study 32]**.  The primary outcome was change from baseline to endpoint in the Children's Depression Rating Scale – Revised (CDRS-R).  **In this study, Lexapro showed statistically significant greater mean improvement compared to placebo on the CDRS-R**.
>
> **The efficacy of Lexapro in the acute treatment of major depressive disorder in adolescents was established, in part, on the basis of extrapolation from the 8-week, flexible-dose, placebo-controlled study with racemic citalopram 20-40 mg/day [*i.e.*, Celexa Study 18]**.  In this outpatient study in children and adolescents 7 to 17 year of age who met DSM-IV criteria for major depressive disorder, **citalopram treatment showed statistically significant greater mean improvement from baseline, compared to placebo, on the CDRS-R; the**

---

[4]    Because Lexapro's current FDA-approved label is "integral to and explicitly relied on in the Complaint," the entirety of the labeling can be considered on this motion to dismiss.  *Horne v. Novartis Pharm. Corp.*, 541 F. Supp. 2d 768, 776 (W.D.N.C. 2008).

> **positive result for this trial largely came from the adolescent subgroup**.
>
> Two additional flexible-dose, placebo-controlled MDD studies (one Lexapro study in patients ages 7 to 17 and one citalopram study in adolescents) did not demonstrate efficacy.

Compl. ¶ 57 (emphasis added); *see also* Abraham Decl. Ex. 2 (FDA-approved Lexapro label).

### B.   THE COMPLAINT ALLEGES THAT LEXAPRO'S FDA-APPROVED LABEL IS FALSE AND MISLEADING

Plaintiffs allege that Lexapro's FDA-approved label is "fundamentally misleading for a variety of reasons." Compl. ¶ 58; *see also id.* ¶¶ 71–72.  *First*, the description of Celexa Study 18 as a positive study[5] allegedly is "materially false" because, in Plaintiffs' view, the study's statistical significance is "predicated on a manipulation of data." *Id.* ¶ 58.  *Second*, the description of Lexapro Study 32 as a positive study allegedly is "misleading" because it "does not provide any indication that the difference between Lexapro and placebo" was, in Plaintiffs' view, "statistically marginal, and not clinically meaningful." *Id.* ¶ 59.  *Third*, the label's statement that Lexapro is a safe and effective treatment for adolescent depression allegedly is "misleading" because "the totality of the data, examined from every perspective, illustrates that Forest's representation [in the FDA-approved label] that Lexapro is an effective treatment for adolescent depression is unsupported." *Id.* ¶¶ 60.

The complaint further asserts that physicians and consumers relied on the FDA-approved label to their detriment by purchasing a drug that allegedly is no more effective than a sugar pill. *Id.* ¶ 72.  Plaintiffs bring claims under several California consumer protection statutes, including the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200;[6] False Advertising Law

---

[5]   A positive study is a study that supports the conclusion, to a statistically-significant degree, that the tested medication is more effective than placebo in treating the tested condition.

[6]   The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  The UCL recognizes three

("FAL"), Cal. Bus. & Prof. Code §§ 17500–17509;[7] and Consumer Legal Remedies Act

("CLRA"), Cal. Bus. & Prof. Code §§ 1770(a), 1780.[8]  Comp. ¶¶ 76–98.  Included in the relief

sought is an injunction barring the sale of Lexapro with its current FDA-approved label.

*Id*. ¶ 103.

The complaint also describes a number of articles and reports, many of which do not

relate to Lexapro, and suggests they reveal that evidence of effectiveness is lacking for

antidepressants as a class, and that the FDA's approval process over the past decades has been

seriously flawed.  *See id.* ¶¶ 21–22; 34–35; 54–55.

### C.   PROCEDURAL HISTORY

On February 5, 2013, this Court refused to certify a class of California consumers who

purchased Celexa for pediatric use.  *See* Memorandum and Order at 12–16, *In re Celexa and*

*Lexapro Mktg. and Sales Practices Litig.*, MDL No. 09-2067 (NMG) (D. Mass. Feb. 5, 2013)

(Dkt. No. 174).  The present complaint was filed on May 3, 2013, in the United States District

Court for the Central District of California, seeking to certify a class of California consumers

who purchased Lexapro for adolescent use.  The complaint was transferred to this Court as a tag-

along action to the Multidistrict Litigation captioned *In re Celexa and Lexapro Mktg. and Sales*

*Practices Litig.*, No. 09–MD–2067 (NMG) (D. Mass).  Defendants now move to dismiss.

---

varieties of unfair competition – practices that are (*i*) unlawful, (*ii*) unfair, or (*iii*) fraudulent.  *See*
*Pfizer, Inc. v. Superior Court*, 105 Cal. Rptr. 3d 795, 801 (Cal. Ct. App. 2010).

[7]   The FAL prohibits a company from knowingly or unreasonably making or disseminating an untrue or
misleading statement in an attempt to sell a product.  Cal. Bus. & Prof. Code §§ 17500–17509.

[8]   The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices" in
connection with the lease or sale of goods or services to a consumer.  Cal. Bus. & Prof. Code §§
1770(a), 1780.

## II.   ARGUMENT

The complaint contends that statements in Lexapro's FDA-approved label relating to efficacy in adolescents are false and misleading.  Yet Plaintiffs also acknowledge that the FDA, in the course of carrying out its statutorily prescribed duty to oversee the approval and marketing of prescription drugs, determined in accordance with its statutorily-mandated procedures that there is substantial evidence of efficacy for the treatment of adolescent depression and authorized the statements in Lexapro's label that Plaintiffs now challenge.  Compl. ¶¶ 51–52.  By law, the FDA's approval of the label constitutes a determination by the FDA that the statements in the label are not false or misleading.  Furthermore, Defendants are required to distribute the label in the manner directed by the FDA.  For these reasons and others, Plaintiffs' claims are barred under California's safe harbor doctrine and preempted by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq*. ("FDCA"), and related FDA regulations.  In the alternative, because the complaint seeks to challenge the FDA's determination that Lexapro is effective for adolescent depression, Plaintiffs' grievances are appropriately directed to the FDA, not this Court.

For these reasons, the complaint should be dismissed in its entirety or, in the alternative, stayed pending referral of the relevant issues to the FDA.

### A.   THE FDA HAS SOLE AUTHORITY OVER THE REGULATION OF PRESCRIPTION DRUGS AND DETERMINATIONS ABOUT EFFICACY.

Congress has entrusted the FDA with sole authority to regulate the approval and marketing of prescription drugs in the United States.  *See, e.g.*, 21 U.S.C. § 393(b).  The FDA's mission is to promote and protect the public health by "promptly and efficiently reviewing clinical research" and ensuring marketed drugs are "safe and effective."  *Id*.  Under the FDCA, drug manufacturers must gain approval from the FDA before marketing a drug in interstate

commerce.  *Id*. § 355(a).  FDA approval can be secured by submitting a New Drug Application

("NDA") or a Supplemental New Drug Application ("sNDA").[9]  An NDA or sNDA is a

compilation of materials that must include "full reports of [all clinical] investigations," *id*. §

355(b)(1)(A), relevant nonclinical studies, and "any other data or information relevant to an

evaluation of the safety and effectiveness of the drug product . . . " 21 C.F.R. § 314.50(d)(2),

(d)(5)(iv).  The NDA or sNDA also must include "the labeling proposed to be used for such

drug," 21 U.S.C. § 355(b)(1)(F), and "a discussion of why the [drug's] benefits exceed the risks

under the conditions stated in the labeling." 21 C.F.R. § 314.50(d)(5)(viii).

The process of submitting an NDA or sNDA is both demanding and lengthy. *See* Report

to Congressional Requesters, Government Accountability Office, Nov. 2006, New Drug

Development, 26 Biotechnology L. Rep. 82, 94 (2007) (noting typical NDA spans thousands of

pages and is based on clinical trials conducted over several years).  Before approving a drug, the

FDA must determine that the drug "meets the statutory standards for safety and effectiveness,

manufacturing and controls, and labeling." 21 C.F.R. § 314.105(c); *see also* Compl. ¶¶ 13, 18.

This includes determining whether there is "substantial evidence that the drug will have the

effect it purports or is represented to have under the conditions of use prescribed, recommended,

or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d)(5).  "Substantial evidence"

exists where there are "data from one adequate and well-controlled clinical investigation" and

other confirmatory evidence sufficient to establish effectiveness.[10]  21 U.S.C. § 355(d)(7); *see*

---

[9]    An sNDA is an application for approval to market a drug already approved by the FDA for a new use
or for use in a new patient population.  NDAs and sNDAs are subject to the same legal requirements
and review by the FDA.  *See* 21 C.F.R. § 314 *et seq*.  FDA approval can also be secured through other
mechanisms not relevant here.

[10]   The complaint erroneously states that two placebo-controlled clinical trials are required.  Compl. ¶¶
23–24.

*also* 21 C.F.R. § 314.126 (defining "adequate and well-controlled" studies).  In determining whether substantial evidence exists, the FDA is "required to exercise its scientific judgment in determining the kind and quantity of data and information an application must provide for a particular drug to meet the statutory standards."  21 C.F.R. § 314.105(c).  Thus, contrary to the complaint's suggestion, Congress has entrusted to the FDA's scientific expertise sole authority over determinations about the efficacy of prescription drugs, and FDA approval reflects a determination that there is substantial evidence supporting efficacy for the intended use.  Compl. ¶ 14 (suggesting FDA approval does not mean drug is "necessarily . . . effective" and that FDA merely "sets the floor, not the ceiling").

In reviewing an NDA or sNDA, the FDA also must determine, "based on a fair evaluation of all material facts," that the proposed product label is not "false or misleading in any particular."  21 U.S.C. § 355(d)(7); *see also* 21 C.F.R. § 314.125(b)(6); *Penn. Emps. Benefit Trust Fund v. Zeneca, Inc.*, 499 F.3d 239, 245 (3d Cir. 2007) (holding that by approving drug application, "FDA has determined that [statements in labeling] are not false or misleading") *vacated*, 129 S. Ct. 1578 (U.S. Mar. 9, 2009) (No. 07-822) (remanding for further consideration in light of *Wyeth v. Levine*, 555 U.S. 555 (2009)), *remanded to* 710 F.Supp.2d 458. (D. Del. 2010) (dismissing consumer protection claims on other grounds); *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1235 (S.D. Fla. 2007) (finding advertisements consistent with FDA-approved label were "not misleading as a matter of law" because "information included in the labeling of a new drug reflects a determination by the FDA that that information is not 'false or misleading'") (*citing* 21 C.F.R. § 314.125(b)(6)); *Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp. 2d 296, 301 (S.D.N.Y. 1998) (same).  The FDA "undertakes a detailed review [of the proposed label] . . .

allowing only information for which there is a scientific basis to be included in the FDA-approved labeling." 73 Fed. Reg. 49,604 (Aug. 22, 2008).

FDA approval is expressly conditioned upon a manufacturer's incorporation of the labeling as directed. 21 U.S.C. § 331(o) (requiring manufacturer to distribute "true and correct copies of all printed matter which is required to be included in any package in which that drug is distributed or sold"); 21 C.F.R. § 314.105(b); 73 Fed. Reg. 2851 (Jan. 16, 2008). Failure to distribute a drug with its FDA-approved label is a criminal offense. *See* 21 U.S.C. §§ 331(c), 333(a), & 352(a), (c). Except in limited circumstances, once a label is approved by the FDA, a manufacturer cannot unilaterally change the label without prior FDA approval. *See* 21 C.F.R. § 314.70(a), (b)(v); *see also* 21 C.F.R. §§ 314.105(b).

### B.    PLAINTIFFS' CLAIMS ARE BARRED BY THE SAFE HARBOR DOCTRINE.

The safe harbor doctrine, broadly recognized at common law and by statute in many states, recognizes that a court cannot sanction a party for engaging in a practice expressly permitted or required by state or federal law. The California Supreme Court adopted the safe harbor doctrine in *Cel-Tech Communications., Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal. 4th 163 (Cal. 1999), holding that "courts may not use the unfair competition law to condemn actions the Legislature permits." *Id.* at 184. The *Cel-Tech* court directed that "[i]f the legislature has . . . considered a situation and concluded no action should lie, courts may not override that determination." *Id.* at 182.

Following the *Cel-Tech* decision, California courts consistently have held that the safe harbor doctrine bars claims brought under the UCL, FAL, and CLRA based on conduct that was specifically authorized by a state or federal regulatory body, whether by statute, regulation, or other action. *See, e.g., Davis v. HSBC Bank Nevada,* 691 F.3d 1152, 1165–66 & n.3 (9th Cir. 2012) (affirming dismissal of UCL claims relating to annual fee disclosures in credit card

applications because federal regulations "clearly permit, and indeed require with equal force" precise disclosure used); *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933–34 (9th Cir. 2011) (affirming dismissal of CLRA and UCL claims relating to fuel pump design reviewed and authorized by California regulatory agency); *Lopez v. Nissan N. Am., Inc.*, 201 Cal. App. 4th 572, 576, 590–92 (Cal. App. 2011) (rejecting claim that odometer calibrated in compliance with federal requirements violated UCL because manufacturer did not disclose additional information).

In *Pom Wonderful LLC v. Coca-Cola Co.*, No. CV 08-06237 SJO, 2013 WL 543361 (C.D. Cal. Feb. 13, 2013), the court rejected claims under the UCL and FAL that a beverage label subject to FDA regulation was misleading, concluding that "Congress has explicitly allowed labeling that is not misleading, and granted the FDA the authority to make such a determination." *Id.* at *5; s*ee also Pom Wonderful LLC v. Coca-Cola Co*, 679 F.3d 1170, 1177 (9th Cir. 2012) ("[F]or a court to act when the FDA has not—despite regulating extensively in this area—would risk undercutting the FDA's expert judgments and authority."). Numerous other courts have applied the safe harbor doctrine nationwide to reject consumer protection claims premised on statements or advertisements that are consistent with an FDA-approved prescription drug label. For example, in *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934 (7th Cir. 2001), the Seventh Circuit affirmed the dismissal of claims brought under the Illinois Consumer Fraud Act where the challenged statements by defendant's consumer hotline operator were consistent with the drug's FDA-approved label and FDA regulations. *Id.* at 941–43. In so holding, the court observed that the manufacturer was "not just specifically authorized" to make the statements in question, but "required to do so" by FDA regulations. *Id.* at 941.[11]

---

[11]   S*ee also Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 427 (7th Cir. 2011) (concluding food labeling complaint failed to state claim for relief because safe harbor protects conduct "specifically authorized

This case presents a particularly compelling situation for applying the safe harbor. Defendants have not merely taken actions permitted under or consistent with the FDCA.  Rather, the FDA ***specifically reviewed and approved*** the efficacy statements in Lexapro's label, and determined, based on the agency's expert interpretation of the clinical data, that there is a scientific basis for the statements and they are ***not false and misleading***.  73 Fed. Reg. 2851 (Jan. 16, 2008).  Furthermore, Defendants are required by federal law to distribute Lexapro with its FDA-approved label as directed.  *See supra* 10.  As such, permitting these claims to proceed would impermissibly allow Plaintiffs to use the consumer protection laws to "condemn actions" the FDA not only permitted, but required.  *Cel-Tech*, 20 Cal. 4th at 184.

### C.      PLAINTIFFS' CLAIMS ARE PREEMPTED UNDER FEDERAL LAW.

Even if Plaintiffs' claims were not clearly barred by California's safe harbor doctrine, they are preempted by federal law and should be dismissed for that additional reason.

The complaint alleges that Defendants have a "duty" under California's consumer protection laws "to fairly and honestly deal with consumers and prescribing healthcare professionals."  Compl. ¶ 61.  Defendants allegedly violated this duty by "artfully omitting . . . material information" from Lexapro's label, with the result that "Forest misled consumers and prescribing healthcare professionals in violation of consumer protection law."  *Id.*  Specifically, Defendants allegedly had a duty to alter the description of pediatric studies in the "Clinical Studies" section of Lexapro's label to state, contrary to the FDA's findings, that Celexa Study 18

---

by the . . . [FDCA and FDA] regulations"); *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d at 1234–35 (applying safe harbor under Florida and Massachusetts law to dismiss consumer protection claims where drug advertising was consistent with FDA-approved labeling); *DePriest v. AstraZeneca Pharm., L.P.*, 351 S.W.3d 168, 177–78 (Ark. 2009) (collecting cases dismissing consumer fraud actions predicated on alleged misrepresentations consistent with FDA-approved drug labeling); *Prohias v. AstraZeneca Pharm., L.P.*, 958 So.2d 1054, 1056 (Fla. Dist. Ct. App. 2007) (applying safe harbor under Florida law where drug advertising was consistent with FDA-approved labeling).

was a negative study, not a positive study, and that the difference between Lexapro and placebo in Lexapro Study 32 was "statistically marginal, and not clinically significant." *Id.* ¶¶ 58–59, 71. Defendants also had a purported duty, again contrary to the FDA's findings, to remove or alter the statement in the label indicating that Lexapro is an effective treatment for adolescent depression. *Id.* ¶¶ 60, 71.[12]  Defendants cannot satisfy these purported state-law duties without also violating their obligations under federal law.

An application of state law that conflicts with federal law is preempted under the Supremacy Clause of the U.S. Constitution. *See* U.S. CONST. art. vi, cl. 2; *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2581 (2011).  Conflict preemption exists where "it is impossible for a private party to comply with both state and federal requirements." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *see also Mut. Pharm. Co. v. Bartlett*, No. 12-142, 2013 WL 3155230, at *6 (U.S. June 24, 2013).  A private party cannot so comply unless it can "***independently*** do under federal law what state law requires of it." *Mensing*, 131 S. Ct. at 2579.  "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those duties for pre-emption purposes." *Id.* at 2581.  Conflict preemption also exists where an application of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

---

[12]  The complaint indicates, for good reason, that Plaintiffs do not seek to hold Forest accountable for committing fraud on the FDA.  Compl. ¶ 52 n.11.  Claims alleging fraud on the FDA routinely are dismissed as preempted. *See, e.g., Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 343 (2001); *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 966 (6th Cir. 2004) (noting that state-law claims based on fraud against the FDA are preempted under *Buckman*).

The complaint cites *Wyeth v. Levine*, 555 U.S. 555 (2009), in support of the assertion that a drug manufacturer "bear[s] sole responsibility for the sufficiency of a drug label."  Compl. ¶ 14 & n.1.  A drug manufacturer's responsibility for product labeling is not unfettered, however, and *Wyeth* and subsequent case law confirm that conflict preemption principles bar state-law claims that undermine the FDA regulatory regime or seek to impose duties inconsistent with federal law, including a purported duty to alter a drug label in a manner that violates FDA regulations.

The only means through which a drug manufacturer may make unilateral changes to a prescription drug label is under the FDA's Changes Being Effected Regulation (the "CBE Regulation"), which permits certain "moderate" changes without prior FDA approval where those changes are based on "newly acquired information."  21 C.F.R. § 314.70(c)(6)(iii); Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 2849 (Jan. 16, 2008) (noting that the CBE Regulation is a "narrow exception" to general rule that the FDA must pre-approve labeling changes).  In *Wyeth*, the Supreme Court held there was no conflict between federal law and a state-law obligation to provide a stronger warning in circumstances where there was new information suggesting that users of the product faced grievous harm, including possible death, if the product was administered by certain methods.  *Wyeth*, 555 U.S. at 573.  Because the CBE Regulation allowed the defendant drug manufacturer to unilaterally make the safety-related changes required under applicable law, the Court held that state-law failure-to-warn claims brought against the manufacturer were not preempted.  *Id.  Wyeth* is inapplicable because, unlike in that case, the FDA has already explicitly reviewed the question of Lexapro's efficacy, as well as all relevant clinical studies and underlying data, and concluded that the statements in the label are accurate. Moreover, the CBE Regulation, even if applicable, does not permit Defendants to unilaterally

make the efficacy and clinical study-related labeling changes Plaintiffs contend were required

under state law.  Accordingly, Defendants could not satisfy their alleged state-law duty without

also violating their obligations under federal law.

*First*, the labeling changes demanded by Plaintiffs would directly contradict expert

judgments already made by the FDA.  All of the relevant clinical studies and attendant data were

submitted to and reviewed by the FDA in connection with its approval of the Lexapro sNDA.

Compl. ¶ 50.  The FDA made its own independent findings on these very issues, ultimately

concluding based on its interpretation of the relevant clinical data that substantial evidence

supports Lexapro's efficacy in treating adolescent depression.  Compl. ¶¶ 51–52; 21 U.S.C. §

355(d) (requiring "substantial evidence" for FDA finding of efficacy).  Because the changes

Plaintiffs seek would require altering the label in a manner that *directly conflicts* with the FDA's

prior findings, and would therefore interfere with the regulatory scheme designed by Congress,

principles of conflict preemption bar Plaintiffs' claims.  *See Wyeth,* 555 U.S. at 571–73 (noting

conflict preemption applies when FDA would not have approved changes made); *Prohias v.*

*Pfizer, Inc*., 490 F. Supp. 2d at 1234–35 ("[P]laintiffs['] efforts to hold [drug manufacturer]

liable for the advertisements conflicts with the FDA's jurisdiction over drug labeling, and

specifically its approval of [the drug]. . . . Those claims are therefore preempted by federal

law."); *In re Bextra and Celebrex Mktg. Sales Practices and Prods. Liab. Litig.*, No. M: 05-1699

CRB, 2006 WL 2374742, at *10 (N.D. Cal. Aug. 16, 2006) (state-law claims preempted where

they "conflict with the FDA's determination of the proper [label] warning and pose an obstacle

to the full accomplishment of the objectives of the FDCA").

*Second*, the labeling changes Plaintiffs demand could not be made unilaterally without

FDA approval under the CBE Regulation because they are based on clinical data already

submitted to and reviewed by the FDA, and therefore are not based on "newly acquired information." *See* 21 C.F.R. § 314.3 (stating that "newly acquired information" does not include clinical study data already submitted for FDA review).[13]   Moreover, these changes are not the type of "moderate" changes permitted by the CBE Regulation: Any change to the "Clinical Studies" section of a drug label is considered a "major" change that cannot be made without prior FDA approval.  *See* 21 C.F.R. § 314.70(b)(2)(v)(A); U.S. DEP'T OF HEALTH AND HUMAN SERVS., FOOD & DRUG ADMIN., CTR. FOR DRUG EVALUATION AND RES., Guidance for Industry: Changes to an Approved NDA or ANDA at 24–25 (2004).  As such, the changes Plaintiffs seek do not meet the basic threshold criteria for application of the CBE Regulation.

　　　*Third*, even if the CBE Regulation were applicable, it would not allow these particular changes.  Pursuant to the CBE Regulation, a manufacturer may "add or strengthen" warnings or instructions related to the safety, dosage or administration of the drug in light of new information received by the manufacturer.  *See* 21 C.F.R. § 314.70(c)(6)(iii)(A)–(C).  A manufacturer may also "*delete* false, misleading, or unsupported indications for use or claims for effectiveness" based on newly acquired information.  *Id.* § 314.70(c)(6)(iii)(D).  It may *not*, however, "add or strengthen," or otherwise modify, claims relating to efficacy.  *Cf.* §§ 314.70(c)(6)(iii)(A)–(C).[14] Satisfying the purported state-law duties Plaintiffs seek to impose would require Defendants to add to, augment or otherwise modify sections of the label by providing additional information about the relevant clinical studies, as well as Lexapro's alleged *lack of efficacy* for treating adolescent depression.

---

[13]   To the extent Plaintiffs suggest that the meta-studies cited in the complaint questioning the efficacy of antidepressants generally are "newly acquired information," most pre-date the FDA's approval of Lexapro for adolescent use.

[14]   The CBE Regulation is therefore designed to allow drug manufacturers to protect the public health by releasing new and essential safety information to consumers as soon as possible.  It is *not* designed, however, to allow drug manufacturers to alter approved labeling statements relating to clinical studies and product efficacy where the underlying clinical data has already been reviewed by the FDA.

Since the *Wyeth* decision was issued, the Supreme Court has reiterated that state-law claims which seek to impose a duty to alter drug labeling in a manner that violates federal law are preempted. *See Bartlett*, 2013 WL 3155230, at *10 (holding state-law design-defect claims brought against generic drug manufacturer premised on inadequate labeling are preempted because federal regulations require that generic labels conform to branded labels); *Mensing*, 131 S. Ct. at 2574–75 (same with respect to state-law failure-to-warn claims).[15]  Courts have adopted this reasoning in the context of state-law claims that seek to impose duties on branded drug manufacturers to change their labels beyond the specific context of safety warnings addressed in *Wyeth* and its progeny. *See, e.g., Hill v. Novartis Pharm. Corp.*, No. 1:06-CV-00939-JSR-SAB, 2013 WL 1953753, at *10–11 (E.D. Cal. May 10, 2013) (excluding testimony suggesting branded drug manufacturer should have changed label formatting because manufacturer could not modify the formatting of a brand-name drug label without FDA approval); *Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780, 796 (Cal. App. 2002) (finding UCL, FAL and CLRA claims preempted which asserted the approved non-prescription drug label "is no longer accurate or adequate and should be changed or the product banned").[16]

---

[15]   Federal courts nationwide have likewise found that a broad range of safety-related labeling claims against generic manufacturers, including consumer protection claims, that seek to impose state-law duties inconsistent with federal law are preempted. *See, e.g., Truddle v. Wyeth, LLC*, No. 2:11-CV-00207-GHD-SAA, 2012 WL 3338715, at *4 (N.D. Miss. Aug. 14, 2012) (holding failure to warn claims against generic manufacturer preempted because FDA sameness regulation did not allow labeling changes); *Eckhardt v. Qualitest Pharm. Inc.*, 858 F. Supp. 2d 792, 796–97 (S.D. Tex. 2012) (same); *In re Darvocet, Darvon and Propoxyphene Prods. Liab. Litig.*, No. 2:11-md-2226-DCR, 2012 WL 718618, at *5 (E.D. Ky. March 5, 2012) (finding consumer protection claims related to generic drug labeling preempted); *In re Fosamax Prods. Liab. Litig. II*, Civ. No. 08-008 (GEB-LHG), 2011 WL 5903623, at *9 (D.N.J. Nov. 21, 2011) (finding consumer protection claims preempted where generic manufacturer "under federal law cannot unilaterally change or update their alendronate sodium labels and simultaneously conform to a state-law duty that requires them to change those labels").

[16]   *Cf. Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 Fed. Appx. 113, 115 (9th Cir. 2012) (concluding labeling-based consumer protection claims were preempted where food label statement "is an express nutrient content claim that the [FDA] not only permits ... but further instructs"); *Turek*, 662 F.3d at

In sum, allowing these claims to proceed would permit private civil litigants to disrupt the Congressionally-dictated framework for the regulation of prescription drugs, and usurp the FDA's sole authority to determine whether a drug is "safe and effective." 21 U.S.C. § 393(b)(2)(B).

### D. PLAINTIFFS' CLAIMS LIE WITHIN THE PRIMARY JURISDICTION OF THE FDA AND ARE NOT PROPERLY REVIEWED BY THIS COURT.

The complaint is also improper under the primary jurisdiction doctrine because it would require this Court to intrude on the FDA's purview as sole regulator of prescription drugs. The court is empowered to dismiss the complaint for this additional reason, or, in the alternative, to grant a stay while Plaintiffs file their grievances with the FDA.

Under the primary jurisdiction doctrine, a court may dismiss or stay pending administrative review any claim that would require the court to resolve questions "within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). In determining whether dismissal or a stay is appropriate, the First Circuit considers three factors: (*i*) whether the agency determination lies at the heart of the task assigned the agency by Congress; (*ii*) whether agency expertise is required to unravel intricate, technical facts; and (*iii*) whether, though perhaps not determinative, the agency determination would materially aid the court. *Pejepscot Indus. Park, Inc. v. Maine Central R.R.*, 215 F.3d 195, 205 (1st Cir. 2000) (internal citations omitted).

*First*, there is no question that Congress has entrusted the FDA with sole authority over prescription drug testing and labeling, and that the complaint's allegations directly challenge the FDA's prior conclusion, based on its review of the relevant clinical data, that Lexapro is

---

427 (affirming dismissal of consumer protection claims imposing dietary fiber labeling requirements different from those adopted by FDA); *Pom Wonderful LLC*, 2013 WL 543361, at *3–5 (finding food labeling claims preempted).

effective for the treatment of adolescent depression.  These are issues at the "heart of the task"

assigned by Congress to the FDA.  *Second*, the determination of whether clinical data supports a

claim for efficacy indisputably is "intricate" and "technical," and therefore properly entrusted to

the expert judgment of the FDA.  Plaintiffs' claims would require this Court to delve into the

clinical data in order to adjudicate whether the FDA properly interpreted those data in approving

Lexapro for adolescent use.  The FDA, not federal courts, has the scientific expertise to evaluate

clinical findings, interpret their meaning, weigh them against each other, and determine whether

they establish substantial evidence of efficacy.  *Third*, the FDA's determination obviously would

materially aid the court—in fact, the FDA has *already made* the determination and concluded

that Lexapro's label is not false or misleading.

Because the complaint raises questions falling squarely within the FDA's primary

jurisdiction—including questions the FDA has already reviewed and adjudicated—dismissal or,

if necessary, a stay pending FDA review of a citizens' petition,[17] is appropriate.  *See, e.g., Pom

Wonderful*, 679 F.3d at 1178 (affirming dismissal of claims challenging beverage label consistent

with FDA regulations and noting courts should "prevent private parties from undermining,

through private litigation, the FDA's considered judgments"); *Aaronson v. Vital Pharm., Inc.*,

No. 09-CV-1333 W(CAB), 2010 WL 625337, at *2–3 (S.D. Cal. Feb. 17, 2010) (dismissing

UCL and FAL claims because "more than the average consumer, [the FDA] knows how to weigh

---

[17]  One appropriate path for seeking FDA review is to file a citizens' petition.  21 C.F.R. § 10.30; s*ee
e.g., Taradejna v. Gen. Mills, Inc.*, 909 F.Supp.2d 1128, 1135 (D. Minn. 2012) (dismissing
consumer protection claims and directing parties to "initiate the proper proceedings with the FDA"); *In re
Human Tissue Prods. Liab. Litig.*, 488 F. Supp. 2d 430, 433 (D.N.J. 2007) (invoking doctrine of
primary jurisdiction and directing plaintiffs to file citizens' petition with the FDA); *Bernhardt v.
Pfizer, Inc.*, Nos. 00 Civ. 4042 LMM, 00 Civ. 4379 LMM, 2000 WL 1738645, at *3 (S.D.N.Y. Nov.
22, 2000) (applying primary jurisdiction doctrine and noting plaintiffs have option of filing citizens'
petition with the FDA).

conflicting studies and determine the most accurate and up-to-date information regarding product safety").[18]

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that this Court reject Plaintiffs' impermissible attempt to usurp the authority specifically entrusted to the FDA and grant Defendants' motion to dismiss the complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

Dated:    July 29, 2013

SUGARMAN, ROGERS, BARSHAK
& COHEN, P.C.
101 Merrimac Street
Boston, MA 02114
Tel.: (617) 227–3030
Fax.: (617) 523-4001

*Of counsel*:

Natasha C. Lisman (BBO # 301700)
William F. Benson (BBO # 646808)
lisman@srbc.com
benson @srbc.com

Respectfully submitted,

/s/ Edwin G. Schallert

DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY  10022
Tel.: (212) 909–6000
Fax: (212) 909–6836

*Of counsel*:

Edwin G. Schallert
Kristin D. Kiehn
J. Robert Abraham
egschall@debevoise.com
kdkiehn@debevoise.com
jrabraham@debevoise.com

*Attorneys for Defendants Forest Laboratories, Inc. and
Forest Pharmaceuticals, Inc.*

---

[18]   *See also Verizon New England, Inc. v. Maine Pub. Utils. Comm'n,* 509 F.3d 1, 12 (1st Cir. 2007) (referring issues to FCC because "divergent state interpretations" would "affect competition and service throughout the nation"); *Mass. v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir. 1995) (referring issues to EPA because determination of a hazardous substance is "specifically within the scope of the EPA's delegated authority" and EPA's expertise was needed to dissect and weigh the arguments); *Palmer Foundry, Inc. v. Delta-HA, Inc.*, 319 F. Supp. 2d 110, 114 (D. Mass. 2004) (referring question of whether chemical qualified as "oxidizer" to OSHA because it has "primary responsibility for defining and classifying dangerous materials"); *Am. Tel. & Tel. Co. v. IMR Capital Corp.*, 888 F. Supp. 221, 244–25 (D. Mass. 1995) (dismissing claims while declining to rule on issues "squarely at the heart of the FCC's mandate").

## <u>CERTIFICATE OF SERVICE</u>

I, J. Robert Abraham, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those attorneys still active indicated as non-registered participants on July 29, 2013.

/s/ J. Robert Abraham

J. Robert Abraham